No. 20-1362

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

City of Minneapolis, et al.,

Appellants,

vs.

Amy Elizabeth Krekelberg,

Appellee.

On Appeal from the United States District Court for the District of Minnesota, The Honorable Donovan W. Frank, presiding

## APPELLANTS' PRINCIPAL BRIEF

Erik Nilsson
Interim City Attorney
Brian S. Carter, No. 0390613
Sharda Enslin, No. 0389370
Ivan Ludmer, No. 0389370
Assistant City Attorneys
350 South Fifth Street, Room 210
Minneapolis, MN 55415
Phone: 612-673-2063
Fax: 612-673-3362
brian.carter@minneapolismn.gov
sharda.enslin@minneapolismn.gov
ivan.ludmer@minneapolismn.gov

SAPIENTIA LAW GROUP, PLLC
Jonathan A. Strauss, 279602
Lorenz F Fett, Jr., 196769
Sonia Miller-Van Oort, 278087
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
Phone: 612-756-7100
Fax: 612-756-7101
jons@sapientialaw.com
larryf@sapientialaw.com
soniamv@sapientialaw.com

SIEBEN CAREY, PA

*Attorneys for Appellants City of Minneapolis and Heather Young*

JARDINE, LOGAN & O'BRIEN, PLLP
Joseph E. Flynn, #165712
8519 Eagle Point Boulevard
Suite 100
Lake Elmo, MN 55042
Phone: 651-290-6500
Fax: 651-223-5070
jflynn@jlolaw.com
tbakke@jlolaw.com
salbrecht@jlolaw.com

*Attorneys for Appellant Matt Olson*

Susan M. Holden, 189844
Jeffrey M. Montpetit, 0291249
Marcia K. Miller, 032162X
901 Marquette Avenue, Suite 500
Minneapolis, MN 55402-3205
Phone: 612-333-4500
susan.holden@knowyourrights.com
jeffrey.montpetit@knowyourrights.com
marcia.miller@knowyourrights.com

*Attorneys for Appellee Amy Elizabeth Krekelberg*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

This appeal encompasses Appellee's Driver's Privacy Protection Act ("DPPA") claims alleging that seventy-four accesses of her data by fifty-eight Minneapolis officers were impermissible under the DPPA. Her claims relate only to whether the accesses were impermissible and what damages flowed from any impermissible accesses. The district court committed reversible error: by admitting evidence of 900 time-barred and unrelated accesses; by admitting evidence of harassment, retaliation, and Minneapolis' investigation of Appellee's claims, all of which occurred years after the accesses; and by instructing the jury that Minneapolis was indemnifying the individual defendants. The district court also erred in instructing the jury that a violation of state law is a per se violation of the DPPA. The jury's award of punitive damages with a 39:1 ratio of punitive to compensatory damages should be remitted. And, finally, seventy-two of the vicarious-liability claims should have been extinguished when the district court dismissed the underlying direct-liability claims on statute-of-limitations grounds. Based on the number of issues presented and the length of the record, Appellants respectfully request twenty-five minutes for oral argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument ..........i

Table of Contents ................................................................................ii

Table of Authorities ...............................................................................iv

Jurisdictional Statement ........................................................................1

Statement of Issues ...............................................................................2

Statement of the Case ..........................................................................4

I.      Facts ..........................................................................................4

II.     Procedural Background..............................................................11

Summary of Argument ..........................................................................16

Argument ..............................................................................................18

I.      A new trial is required because the district court abused
        its discretion and caused substantial prejudice by: (1) admitting
        evidence of more than 900 irrelevant and time-barred accesses;
        (2) admitting evidence of harassment, retaliation, and an
        alleged failure to investigate; and (3) instructing the jury that
        Minneapolis was indemnifying the individual defendants..........18

        A.      The district court abused its discretion ...............................18

        B.      These three errors, along and in cumulative effect, denied
                Appellants a fair trial..........................................................27

II.     A new trial is also warranted because the district court erred
        in instructing the jury that a violation of state law was a
        per se violation of the DPPA .......................................................39

III. This Court should remit the jury's punitive damages award because of a failure to show reprehensibility and because they are grossly excessive ....................................................................45

IV. Appellee's vicarious-liability claims fail because the statute-of-limitations dismissal of the direct-liability claims in "on the merits" under federal law and thereby forecloses vicarious liability .........................................................................................49

    A.    When the DPPA was enacted in 1994, dismissal of a claim against an agent on statute of limitations grounds mandated dismissal of vicarious-liability claims ............... 50

    B.    The correct rule bars vicarious liability where individual liability is foreclosed, contrary to some recent divergent authority ...........................................................................58

V. Conclusion ....................................................................................65

VI. Certificate of Compliance ...........................................................67

VII. Certificate of Service ..................................................................69

# TABLE OF AUTHORITIES

CASES

*Al-Shimmari v. Detroit Med. Ctr.,*
731 N.W.2d 29 (Mich. 2007) ............................................................... 57

*Am. Bank of St. Paul v. TD Bank, N.A,*
713 F.3d 455 (8th Cir. 2013) ................................................. 18, 27, 50

*Bates v. United States,*
522 U.S. 23 (1997) ................................................................................ 40

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) .............................................................................. 46

*Buettner v. Cellular One, Inc.,*
700 So. 2d 48 (Fla. Dist. Ct. App. 1997)............................................. 57

*Cameron v. Osler*,
930 N.W.2d 661 (S.D. 2019) ................................................................ 57

*Chism v. CNH Am. LLC,*
638 F.3d 637 (8th Cir. 2011) .................................................. 18, 27, 32

*Cohen v. Alliant Enters., Inc,*
60 S.W.3d 536 (Ky. 2001) ..................................................................... 57

*Crossley v. Georgia-Pac. Corp.,*
355 F.3d 1112 (8th Cir. 2004) .............................................................. 61

*Deicher v. City of Evansville,*
545 F.3d 537 (7th Cir. 2008) ................................................................ 48

*Diesel Mach., Inc. v. B.R. Lee Indus., Inc.,*
418 F.3d 820 (8th Cir. 2005) ......................................................... 46, 47

*Ebmeier v. Stump,*
70 F.3d 1012 (8th Cir. 1995) ................................................................ 40

*Grabinski v. Blue Springs Ford Sales, Inc,*
203 F.3d 1024 (8th Cir. 2000) .............................................................. 48

*Greco v. Univ. of Delaware,*
619 A.2d 900 (Del. 1993) ...................................................................... 56

*Green v. Baron,*
879 F.2d 305 (8th Cir. 1989) ................................................................ 26

*Griffin v. Hilke,*
804 F.2d 1052 (8th Cir. 1986) ..................................................... 2, 26, 27

*Halladay v. Verschoor,*
381 F.2d 100 (8th Cir. 1967) ................................................................ 26

*Horras v. Leavitt,*
495 F.3d 894 (8th Cir. 2007) ................................................................ 23

*Hughes v. Doe,*
639 S.E.2d 302 (Va. 2007) .................................................................... 57

*JCB, Inc. v. Union Planters Bank, NA,*
539 F.3d 862 (8th Cir. 2008) ................................................................ 47

*Juarez v. Nelson,*
2003-NMCA-011, 61 P.3d 877 ............................................................... 57

*Kapitan v. DT Chicagoland Express Inc.,*
Civ. No. 2:12-321, 2013 WL 5655704, ................................................. 57

*Karaduman v. Newsday, Inc.,*
51 N.Y.2d 531 (1980) ........................................................................... 57

*Leow v. A & B Freight Line, Inc.,*
676 N.E.2d 1284 (Ill. 1997) ........................................................... 55, 59

*Mallak v. City of Brainerd,*
No. CV 13-2119 (DWF/LIB), 2017 WL 440249 .................................... 44

*Menghi v. Hart,*
745 F. Supp. 2d 89 (E.D.N.Y. 2010) .................................................... 49

*Meyer v. Holley,*
537 U.S. 280 (2003) ............................................................................ 51

*Myers v. Bull,*
599 F.2d 863 (8th Cir. 1979) ............................................................... 54

*Monell v. Dep't of Soc. Servs. of City of New York,*
436 U.S. 658 (1978) ............................................................................ 23

*Ondrisek v. Hoffman,*
698 F.3d 1020 (8th Cir. 2012) ................................................... 3, 45, 46

*Orduno v. Pietrzak,*
932 F.3d 710 (8th Cir. 2019) ........................................................ passim

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) ................................................................... 55, 59

*Preis v. Lexington Ins. Co,*
508 F. Supp. 2d 1061 (S.D. Ala. 2007) .................................................. 57

*Smithrud v. City of St. Paul,*
No. 10-4452 (JNE/JSM), 2012 WL 4129299 .......................................... 41

*Stanley ex rel. Estate of Hale v. Trinchard,*
579 F.3d 515 (5th Cir. 2009) ............................................................ 57

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003) ................................................................... 45, 47

*Stephens v. Petrino,*
86 S.W.3d 836 (Ark. 2002) ............................................................. 57

*Tomlinson v. George,*
2005-NMSC-020, 116 P.3d 105 .......................................................... 57

*Truesdell v. Thomas,*
No. 5:13-cv-552-Oc-10PRL, 2016 WL 7205490 ...................................... 49

*United States v. Guerrero–Cortez,*
110 F.3d 647, 652 (8th Cir. 1997) ...................................................... 19

*Ventura v. Kyle,*
825 F.3d 876 (8th Cir. 2016) ....................................................... 26, 28

*Verrastro v. Bayhospitalists, LLC,*
208 A.3d 720 (Del. 2019) ............................................................ 56, 57

*Williams v. City of Kansas City, Mo.,*
223 F.3d 749 (8th Cir. 2000) ...................................................... 27

*Williams v. ConAgra Poultry Co.,*
378 F.3d 790, 796 (8th Cir. 2004) ............................................. 46

*Williams v. Nix,*
1 F.3d 712 (8th Cir. 1993) .......................................................... 41

*Williams v. Taylor,*
529 U.S. 420 (2000) .................................................................... 40

## STATUTES, RULES, AND CONSTITUTIONAL PROVISIONS

18 U.S.C. § 842 ........................................................................... 41

18 U.S.C. § 922 ........................................................................... 41

18 U.S.C. § 1030 ......................................................................... 41

18 U.S.C. § 1955 ......................................................................... 41

18 U.S.C. § 1958 ......................................................................... 41

18 U.S.C. § 1959 ......................................................................... 41

18 U.S.C. § 2172 ......................................................................... 1

18 U.S.C. § 2331 ...................................................................41

18 U.S.C. § 2701 ...................................................................41

18 U.S.C. § 2721 .....................................................................1

28 U.S.C. § 1291 .....................................................................1

28 U.S.C. § 1331 .....................................................................1

Federal Rules of Evidence 401-403.........................................2

## JURISDICTIONAL STATEMENT

Because Appellee asserts claims under 18 U.S.C. § 2721, the district court has federal-question jurisdiction. 28 U.S.C. § 1331.

On February 13, 2020, the district issued an order denying Appellants' timely motion for judgment notwithstanding the verdict and for a new trial. Add.4. Judgment was entered that day. Add.1. Appellants filed a notice of appeal on February 20, 2020. A113.

This Court has jurisdiction over this appeal from final judgment under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

1.      The trial below encompassed Appellee Amy Elizabeth

Krekelberg's Driver's Privacy Protection Act (DPPA) claims based on

seventy-four accesses of her data by fifty-eight Minneapolis officers.

Under the DPPA and applicable vicarious-liability law, the claims

related only to the employees' wrongdoing, not any wrongdoing by

Minneapolis. Did the district court err by (1) admitting evidence of 900

time-barred and unrelated accesses by more than forty government

agencies; (2) admitting evidence of Minneapolis's response to Appellee's

allegations, and evidence of harassment and retaliation by unnamed

Minneapolis employees, all of which occurred years after the accesses

when Appellee eventually became a Minneapolis employee; and (3)

instructing the jury that Minneapolis was indemnifying the individual

defendants?

Apposite Authority:

        Federal Rules of Evidence 401-403;

        *Orduno v. Pietrzak*, 932 F.3d 710 (8th Cir. 2019);

        *Griffin v. Hilke*, 804 F.2d 1052 (8th Cir. 1986).

2.     Did the district court err in instructing the jury that a violation of state law is a per se violation of the DPPA, which allows a broader use of driver's license data than Minnesota state law?

Apposite Authority:

     18 U.S.C. § 2721(b)(1);

     *Bates v. United States*, 522 U.S. 23 (1997).

3.     Should this Court remit punitive damages where the jury awarded a 39:1 ratio of punitive to compensatory damages and there was no meaningful showing of reprehensibility?

Apposite Authority:

     *Ondrisek v. Hoffman*, 698 F.3d 1020 (8th Cir. 2012).

4.     Does a statute-of-limitations dismissal of direct-liability DPPA claims foreclose vicarious liability, where, under established vicarious-liability law when the DPPA was enacted, vicarious liability is extinguished?

Apposite Authority:

     *Orduno v. Pietrzak*, 932 F.3d 710 (8th Cir. 2019);

     Restatement (Second) of Agency § 217B.

## STATEMENT OF THE CASE

### I.    Facts

At trial were seventy-four accesses of Appellee's driver's license data performed by fifty-eight Minneapolis police officers from December 2009 to August 2012. A2169. Appellee alleged that these accesses were illegal under the Driver's Privacy Protection Act and that she was entitled the damages caused by the accesses.

When the seventy-four accesses occurred, Appellee was a patrol officer for the Minneapolis Park Police Department (PPD). A862. The PPD is a separate organization from the Minneapolis Police Department (MPD). A828. The PPD is operated by the Minneapolis Parks and Recreation Board, which is a government agency separate from Minneapolis. A862. As such, PPD officers are not employees of Minneapolis. Appellee testified that during the time of the accesses of her data, she dated and eventually married another PPD officer, Keith Rowland. A858. Appellee also testified that she was the subject of flirting and romantic interest by other law enforcement officers, including some of the MPD officers who accessed her data from 2009 to 2012. *See*, *e.g.*, A936. Appellee testified that the quality of her policing

generated interest, such as when she won an Officer of the Year Award in 2010. A968.

Over Appellants' objection, Appellee also testified about and introduced evidence of all accesses of her data by all Minnesota agencies, spanning from 2003 to 2012. A883-84; Trial Ex. App. vol. I at 3-72, Pl.'s Exs. 2-3. According to Appellee, from 2003 to 2012, officers and employees from 40 different Minnesota law enforcement agencies accessed her data. *Id.* Beyond the accesses of the fifty-eight MPD officers whose accesses were on trial, Appellee testified that more than 200 MPD officers accessed her data. A884. As noted above, fifty-eight officers were responsible for the seventy-four accesses that were being tried. Accordingly, some of the fifty-eight officers accessed Appellee's data more than once from 2009 to 2012. Additionally, some of these officers accessed Appellee's data before 2009—this corresponds to approximately fifty accesses, Trial Ex. App. vol. I at 78-105, Pl.'s Ex. 6, but all claims based on these fifty accesses were dismissed as time-barred. Aside from the 1000 accesses of Appellee's data, Appellee also submitted evidence of accesses of *third-party* data by the fifty-eight

officers. *Id.* This included accesses of sports celebrities' data and other law enforcement officers' data. *See, e.g.*, A941-42.

In September of 2012—after all the accesses of her data— Appellee began new employment with Minneapolis as a patrol officer. A862.

In 2013, Appellee received a letter from the Minnesota Department of Natural Resources indicating that her driver's license data had been accessed. A882. Appellee then contacted the Minnesota Driver and Vehicle Services ("DVS") and requested a full audit of the accesses of her data. *Id.* The audit, Trial Ex. App. vol. I at 3-34, Pl.'s Ex. 2, showed over 1000 accesses by more than forty different law enforcement agencies. A883, Trial Ex. App. vol. I at 3-34, Pl.'s Ex. 2. About half of the accesses were performed by MPD officers. *Id.* Appellee then received a second audit, Trial Ex. App. vol. I at 35-72, Pl.'s Ex. 3, which showed the same accesses but indicated how many individual login accounts had been used—this indicated to Appellee that approximately 200 MPD officers accessed her data. A884. Appellee testified extensively that these accesses caused her emotional distress, such as feeling "ill," "sick to my stomach," "really violated." A883-84.

Immediately after this testimony, the district court read an instruction to the jury:

> Evidence of certain accesses before December 17 of 2009 are being admitted only for the purpose of helping you evaluate the state of mind, intent, knowledge, lack of mistake or action on the part of each officer involved, and to provide you the circumstances under which the accesses occurred and the reactions, state of mind of the plaintiff.

A885. Notably, the only damages claimed by Appellee were garden-variety emotional distress damages—she did not claim damages from physical injury or financial damages. *See, e.g.*, A988. Thus, all 1000 accesses were submitted to the jury to show Appellee's emotional distress damages through her state of mind.

Throughout the trial, Appellants presented substantial evidence that officers used the drivers' license database as a kind of photo-directory of area law enforcement officers. *See, e.g.*, A1040-41; A1372-73. Appellee herself acknowledged that use during her closing argument. A2146-47, 2157. Further, in resolving Appellee's motion for equitable relief, the district court found that the evidence established that "sworn officers of the MPD reasonably require access to an internal directory of their fellow officers which includes identification photographs." Add.36.

Appellee testified at length about the alleged retaliation and harassment she experienced as a result of alleging MPD officers violated the DPPA. She testified she felt excluded by MPD coworkers. A981. She testified about being intimidated by a suspicious car showing up at her home twice, which she speculated was an MPD officer attempting to intimidate her. A984-85. Appellee testified that this alleged intimidation made her fear for her and her children's safety. A981. Appellee concluded her direct testimony with a recap of all the alleged retaliation she suffered for having accused MPD officers of DPPA violations—retaliation, not by the fifty-eight officers whose accesses were at issue in this case, but by unidentified Minneapolis employees. A990-94. She described being ostracized and excluded from shift meals. She described her name tag being knocked to the ground and stepped on. She described not getting part-time work outside of her Minneapolis employment. And, with her most inflammatory allegation, she described how officers failed to back her up with assistance on the streets. These acts, she testified, were retaliation in response to her DPPA accusations. *Id.* None of these acts, however, were ever

attributed to any of the fifty-eight MPD officers whose conduct was on trial, nor were they tied to the years-earlier accesses of Appellee's data.

Appellee was also allowed to testify about being harassed and discriminated against by MPD Sergeant Madson, and that when she reported the discrimination and harassment she was retaliated against. A866-69. This testimony, objected to by Appellants, was wholly unrelated to the DPPA claims at trial.

Additionally, Appellee offered the testimony of a retired Minneapolis police officer, Joel Carlson, and an expert witness, Michael Quinn, to explain the ways in which she was retaliated against by Minneapolis and its employees. A1075-122; A1968-80.

Again, over Appellants' objection, Appellee submitted much evidence of Minneapolis's investigation into the DPPA accesses of her data. Appellee's opening argument explained her theory: "[T]he evidence will show you, ladies and gentlemen, that Defendant Minneapolis did not address the officers' conduct but effectively tried to cover it up." A653. Appellee then explained how the four most recent accesses were investigated thoroughly by Sergeant Matthew McLean. The other seventy accesses were investigated, not by McLean, but two

different sergeants, Jose Gomez and Clark Goset. Appellee asserted that the investigations done by Gomez and Gosset were neither thorough nor fair, but were designed to "cover up" the impermissible accesses of Appellee's data.[1] A653-54. Appellee introduced thousands of pages of evidence from the internal affairs files. Trial Ex. App. vols. II-VIII, Pl.'s Exs. 43, 49, 54, 58, 76, 79, 82, 85, 88, 94, 96, 101, 106, 108, 110, 115, 121, 126, 129, 134, 137, 139, 141, 144, 148, 152, 160, 163, 165, 168, 170, 173, 175, 177, 181, 184, 186, 190, 192, 193, 195, 197, 199, 201, 203, 205, 208, 209, 212, 215, 219, 224, 226, 229.

She called more witnesses on this subject than any other: Matthew McLean, Jose Gomez, Clark Goset, and Jason Case. In fact, she called more witnesses involved in the investigations than she did actual accessors of her data.

Two of the investigations done by McLean were of the accesses by Appellants Young and Olson. Those investigations resulted in discipline to both Young and Olson, with Young receiving a letter-of-reprimand

---

[1]    As a factual matter, Minneapolis vehemently denies this theory. This dispute is not germane to the issues on appeal here, so Appellants will recount neither the evidence nor the procedural details surrounding it.

and Olson being terminated based on an allegation that he had been untruthful during his statement. Trial Ex. App. vol. II at 269-465, Pl.'s Ex. 43. Olson arbitrated his termination and won reinstatement, with the arbitrator finding that Olson was merely mistaken, not dishonest. Trial Ex. App. vol. III at 489, Pl.'s Ex. 47.

Appellee continues to be employed as an MPD officer.

## II.   Procedural Background

Spanning more than six years and more than a hundred parties, the procedural history of this case is long and complicated. Appellants therefore limit this description to that necessary for this appeal.

Appellee initiated this lawsuit on December 17, 2013, when she filed the Complaint with the district court. A44. The Complaint named more than forty local government agencies, including counties and municipalities; two state commissioners; 30 state-employed "Doe" defendants; and 1000 local law enforcement officer "Doe" defendants. The Complaint alleged various causes of action, including the DPPA claims that survived to trial. The state defendants and local government agencies moved to dismiss the Complaint on a variety of grounds. Add.179. The district court dismissed the state defendants, all

causes of action except the DPPA claims, and applied the DPPA's four-year statute of limitations to dismiss all DPPA claims based on accesses occurring before December 17, 2009. Add.189-92. This left approximately 130 accesses by Doe employees and the associated vicarious liability claims against twelve governmental agencies. Add.182.

On June 16, 2015, Appellee filed her Amended Complaint, naming the Doe defendants who had performed the accesses that survived the district court's statute-of-limitations ruling. Add.157. The named defendants included the fifty-eight MPD officers whose accesses were the subject of the trial. Add.155. Fifty-four of these officers filed a motion to dismiss based on the statute of limitations and argued that the Amended Complaint did not relate back to the original complaint. In other words, they argued that the statute of limitations had run in between the time the original Complaint was filed and when the Amended Complaint was filed. Add.161. The district court agreed and dismissed the individuals whose accesses occurred before June 16, 2011. A165-66. Setting aside two individuals voluntarily dismissed from the

lawsuit, this essentially left Appellants Young and Olson as the sole MPD individual defendants. Add.166.

Minneapolis then moved for judgment on all vicarious-liability claims that were based on time-barred direct-liability claims. Add.67. The district court denied the motion and the vicarious-liability claims survived. Add.66. In this same order, the district court held that punitive damages could not be awarded against municipalities, like Minneapolis. Add.95.

Minneapolis then filed for summary judgment on a select number of the accesses, arguing that Appellee's claim of an impermissible access failed for seventeen accesses and that those accesses should be dismissed under Federal Rule of Civil Procedure 56. The district court disagreed, and all seventy-four accesses by fifty-eight MPD officers survived. Add.64.

By trial, Appellee had settled her claims with all the defendants except for Minneapolis and Appellants Young and Olson, e.g., the eleven other government agencies against whom Appellee had timely claims. *See* Add.3.

The remaining parties engaged in extensive motion in limine practice, with the defendants filing twelve motions, and Appellee filing six. Add.45-53. Pertinent to this appeal, Appellants moved: (a) to exclude evidence of all accesses except for the seventy-four at issue, Add.47-48; (b) for a ruling that Minneapolis was not vicariously liable, Add.49; (c) to exclude evidence of retaliation and harassment of Appellee, Add.49-50; and (d) to exclude evidence of Minneapolis's response into Appellee's allegations of DPPA violation, Add.51. Setting aside carved-out exceptions not relevant here, the district court denied all of these motions. Add.47-51.

At the close of Appellee's case, Appellants moved for judgment as a matter of law, and the district court denied the motion. A1687. At the close of evidence, Appellants renewed the motion, which was denied. A1918, A1931-32.

Two of the district court's jury instruction are pertinent to this appeal. First, the district court instructed the jury that Minneapolis would be paying *all damages* assessed to the individual defendants, Appellants Young and Olson. A2202. Appellants objected strenuously to this instruction. A2051. Additionally, the district court, at the close of

evidence, made the novel ruling that as a matter of law a violation of Minnesota state law restricting the use of drivers' license data was a *per se* violation of the DPPA and instructed the jury as such. A2199. Appellants objected to this instruction. A2049.

After the case was submitted, the jury returned a verdict finding liability for all seventy-four accesses; awarding $285,000 in compensatory damages; and $150,000 in punitive damages against each Appellants Young and Olson, resulting in a total award of $585,000. A2223-24.

Appellants then timely moved for a new trial and judgment notwithstanding the verdict on a variety of grounds, including all the issues raised in this appeal. Add.13-25; A2271-313. The district court denied the motion on February 13, 2020, with judgment being entered the same day. A112-13. Appellants noticed this appeal a week later, on February 20, 2020. A113.

## SUMMARY OF ARGUMENT

I.    The trial below encompassed Appellee's DPPA claims based on seventy-four accesses of her data by fifty-eight Minneapolis officers. Under the DPPA and applicable vicarious-liability law, the claims related only to whether the individual officers impermissibly accessed Appellee's data, and what, if any, damages flowed from any impermissible accesses. Notwithstanding this limited scope, the district court admitted evidence of 900 time-barred and unrelated accesses by more than forty government agencies, including time-barred accesses performed by nearly one-hundred-and-fifty additional Minneapolis officers. The district court admitted evidence of harassment and retaliation of Appellee by unnamed Minneapolis employees that occurred years after the accesses. The district court also instructed the jury that Minneapolis was indemnifying the individual defendants. These ruling were an abuse of discretion that substantially influenced the verdict. Appellants are therefore entitled to a new trial.

II.    The district court instructed the jury that a violation of state law is a per se violation of the DPPA. This was an abuse of discretion because the DPPA allows a broader use of driver's license data than

Minnesota state law. Further, the instruction, combined with Plaintiff's Ex. 8R, which purported to define the applicable Minnesota state law and was referred to in Appellee's closing, assured that the jury would find all seventy-four accesses violated the DPPA. The erroneous jury instruction therefore substantially influenced the verdict and a new trial is warranted.

III.   The jury awarded $150,000 in punitive damages to each individual defendant, Appellants Young and Olson. This corresponds to a 39:1 ratio of punitive to compensatory damages. Young and Olson each performed a single access and there was no meaningful showing of reprehensibility. The punitive damages award is therefore grossly excessive and unconstitutional.

IV.   Seventy-two of the vicarious-liability claims arise from direct-liability claims that were dismissed by the district court as time-barred. Under the vicarious-liability law established when the DPPA was enacted, a vicarious-liability claim is extinguished when the underlying direct-liability claim is dismissed on statute-of-limitations grounds. Minneapolis should therefore be granted judgment on all vicarious-liability claims based on time-barred direct-liability claims.

# ARGUMENT

**I.   A new trial is required because the district court abused its discretion and caused substantial prejudice by: (1) admitting evidence of more than 900 irrelevant and time-barred accesses; (2) admitting evidence of harassment, retaliation, and an alleged failure to investigate; and (3) instructing the jury that Minneapolis was indemnifying the individual defendants.**

This Court reviews a district court's evidentiary rulings and jury instructions for an abuse of discretion. *See Chism v. CNH Am. LLC*, 638 F.3d 637, 640 (8th Cir. 2011); *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 467 (8th Cir.  2013). To justify reversal for an evidentiary error, an appellant must show (1) abuse of discretion and (2) that the error affected the party's "the substantial rights or had more than a slight influence on the verdict." *See Chism*, 638 F.3d at 640.

## A.   The district court abused its discretion.

### 1.   The district court abused its discretion by admitting more than 900 time-barred and unrelated accesses, including accesses by nonparties.

Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." While relevant evidence is generally admissible, a court should

18

exclude evidence under Rule 403 if its probative value is substantially outweighed by its unfair prejudice. Rule 403 therefore operates to prevent the risk of a jury deciding the case on an improper basis. *United States v. Guerrero–Cortez*, 110 F.3d 647, 652 (8th Cir. 1997).

The district court admitted evidence of 900 unrelated and time-barred accesses. These accesses can be categorized into three groups: (1) time-barred accesses by one of the fifty-eight officers who performed the seventy-four accesses at issue in the trial; (2) time-barred accesses by other Minneapolis police officers; and (3) most prejudicially, accesses by officers from other agencies. *See* Trial Ex. App. vol. I at 3-72, 106-159, Pl.'s Exs. 2, 3, 7.

The district court held that these accesses were admissible to show: "the state of mind, intent, knowledge, and lack of mistake or accident by each officer involved and does not constitute propensity evidence. Moreover, the time-barred accesses of Plaintiff's information are relevant to actual damages and provide important context to the circumstances under which the accesses occurred." Add.48. The district court also communicated this reasoning to the jury:

> Evidence of certain accesses before December 17 of
> 2009 are being admitted only for the purpose of helping you

> evaluate the state of mind, intent, knowledge, lack of
> mistake or action on the part of each officer involved, and to
> provide you the circumstances under which the accesses
> occurred and the reactions, state of mind of the plaintiff.

A885. The 900 accesses were therefore admitted to show (1) the officers'

state of mind, intent, knowledge, lack of mistake or action; and (2)

Appellees' state of mind, which the district court made clear was

pertinent to damages. Add.48; A447.

The district court's conclusion that the 900 accesses are

permissible to show officers' state of mind only applies to the first

category of accesses, which comprises just fifty of the 900 accesses. Trial

Ex. App. vol. I at 77-105, Pl.'s Ex. 6. This is because there is no evidence

that any of the fifty-eight officers had any knowledge of the accesses in

categories 2 and 3. For example, an access by a Hastings Police

Department officer from 2004, *see id.* at 78, has no relation or relevance

to the accesses by MPD officers between December 2009 and August

2012. Accordingly, the district court's 404(b) theory of relevance cannot

apply to the second and third categories of accesses described above—

leaving approximately 850 accesses wanting of relevance.

The district court's justification for these 850 accesses was

Appellee's claim for damages—to show emotional distress by showing

her state of mind. This ruling was an abuse of discretion. Under the law, the damages available to Appellee are those flowing from the seventy-four accesses at issue in trial. Allowing Appellee to extend her damages to include accesses that were time-barred and not even involving any Appellant was error. Moreover, the accesses that were not time-barred and that involved other agencies had been settled and Appellee had already recovered for those accesses. The district court's admission of these accesses to show Appellee's damages therefore allowed for double recovery. The district court clearly erred in admitting the 850 accesses.

This Court's reasoning in *Orduno v. Pietrzak* supports this conclusion. 932 F.3d 710, 719 (8th Cir. 2019). In *Orduno*, another DPPA case, this Court concluded that excluding any accesses not directly at issue in the trial was not an abuse of discretion. The Court held that "[a]llowing evidence of other obtainments risked encouraging the jury to award damages based on time-barred incidents for which [defendant] *could not be liable*." 932 F.3d 710, 719 (8th Cir. 2019) (emphasis added). The Court held that the evidence "lacked probative value and carried too great a risk of unfair prejudice, confusing the issues, and wasting

time in mini-trials over the propriety of other obtainments." *Id.* Here, the district court went beyond merely risking a jury award on time-barred incidents—it explicitly held and told the jury that damages *could flow from the time-barred incidents*. The same is true for the hundreds of accesses by individuals at other law enforcement agencies—Appellants cannot be liable for the damages flowing from those accesses, and it was an abuse of discretion for the district court to admit them for that very purpose.

## 2. The district court abused its discretion by admitting evidence of alleged harassment, retaliation, and a failure to investigate.

The district court explicitly admitted evidence temporally and substantively unrelated to Appellee's DPPA claims to prove Appellee's damages. Add.49-50. There was no evidence to suggest that either Olson or Young, or any of the other fifty-eight officers, knew of any alleged retaliation. And there was certainly no allegation that any of the fifty-eight officers committed the retaliatory acts. The alleged retaliation, in fact, occurred years after Appellee's data was accessed. As such, the evidence was irrelevant to the claims against Olson and Young, or any of the other fifty-eight officers. Further, whether

Minneapolis robustly investigated Appellee's claims had nothing to do with any of the accesses. There was neither allegation nor evidence that any of the fifty-eight officers controlled Minneapolis's internal affairs investigations. Appellee's coverup theme therefore had no relevance to the claims against them.

Further, as admitted against Minneapolis, the district court's error was particularly insidious. Vicarious liability "imputes the negligence of the servant to the master and makes the latter liable for the torts of the former." *Horras v. Leavitt*, 495 F.3d 894, 904 (8th Cir. 2007) (quotation marks omitted). The doctrine is based solely on the wrongdoing of the agent. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 693–94 (1978). Here, none of the fifty-eight officers were alleged to have retaliated against Appellee or harassed her because of her DPPA claims. Minneapolis is only liable insofar as the agent would be liable. Accordingly, any alleged wrongdoing by Minneapolis was not within the proper scope of this trial. This was not a retaliation or harassment lawsuit against Minneapolis, but the district court allowed Appellee to turn it into one under the guise of a DPPA lawsuit. Any alleged culture of coverup and retaliation is not

relevant to this lawsuit because Appellant's vicarious-liability claims have nothing to do with any alleged wrongdoing by Minneapolis. By admitting this evidence as to damages, the district court invited the jury to punish Minneapolis for its alleged transgressions under the guise of vicarious-liability claims, which should have been limited to the seventy-four accesses at issue.

*Orduno* further supports this conclusion:

> Orduno challenges the court's exclusion of evidence concerning the City's response to Pietrzak's misconduct. The district court ruled that evidence of the City's official response was inadmissible because it did not cause any damages: "The damages flowed from the six illegal obtainments and the admission of liability." R. Doc. 287, at 30. Orduno argues that evidence of the City's inaction supported a larger award of punitive damages, because Pietrzak was not otherwise disciplined for his wrongful conduct by the City. But where *no question of the City's direct liability was before the jury*, the court did not abuse its discretion in focusing the trial on the harm that Pietrzak's six admitted violations caused Orduno.

*Orduno*, 932 F.3d at 719. Implicit in *Orduno* is that the plaintiff was only entitled to damages flowing from the impermissible accesses; the city's response was not a source of damages. Here, the district court explicitly held that Appellee could use Minneapolis's response as "evidence [that] goes to the issue of damages." Add.51. The district

court's ruling cannot be squared with *Orduno* and was an abuse of discretion.

Of course, *Orduno* does not present precisely the same situation as this case. In *Orduno*, this Court ruled that it was *not an abuse of discretion to exclude* evidence of the city's response. Thus it did not rule out admitting an employer's response for the limited purpose of supporting punitive damages. Also, *Orduno* did not deal with a plaintiff who was an employee of the vicariously liable employer, and the defendant in *Orduno* admitted liability, focusing the trial on damages. But none of these points undermines the conclusion above. First, the district court did not limit the evidence to punitive damages, but instead allowed it to bear on all damages. Further, only Young's and Olson's accesses could result in punitive damages, so Minneapolis's response to the other seventy-two accesses was not relevant to punitive damages. Second, the fact that Appellee was a Minneapolis employee when she made her claims of impermissible accesses is irrelevant because when her data was accessed, Appellee was not a Minneapolis employee. With the exception of Olson's single access, no one, including Appellee and Minneapolis, could have predicted that Appellee would

become a Minneapolis employee and then sue out DPPA claims. Finally, the district court did not limit its admission of these accesses to liability (which would still have been error), but specifically allowed them to be considered for damages, which was the precise concern in *Orduno*.

3. **The district court's instruction to the jury that Minneapolis was indemnifying Appellants Young and Olson was an abuse of discretion.**

Unless it is material, informing a jury of a defendant's insurance or indemnification protection is extremely prejudicial and should not be permitted. *Green v. Baron*, 879 F.2d 305, 310 (8th Cir. 1989). This Court has warned "the [district] court should not instruct the jury that the State of Iowa will indemnify the defendants. The instruction is extremely prejudicial." *Id.* Injecting a party's indemnification status inhibits a just verdict. *Halladay v. Verschoor*, 381 F.2d 100, 112 (8th Cir. 1967). A jury who finds out that a defendant is indemnified may very likely award a plaintiff "unduly generous" damages. *Griffin v. Hilke*, 804 F.2d 1052, 1057 (8th Cir. 1986).

In *Griffin*, the Court held that allowing comments by plaintiff's counsel during closing remarks that the government would pay damages in a § 1983 case was prejudicial error. 804 F.2d at 1057-58.

More recently, in *Ventura v. Kyle*, this Court held that it was "utterly repugnant to a fair trial or . . . a just verdict for the jury to hear that the damages sued for . . . will be taken care of by an insurance company." 825 F.3d 876, 886 (8th Cir. 2016) (quotation marks omitted) (alteration in original). The same is true here: the district court informing the jury that Minneapolis was indemnifying Appellants Young and Olson was utterly repugnant to a fair trial.

### B. These three errors, alone and in cumulative effect, denied Appellants a fair trial.

To justify reversal, evidentiary error must have affected the substantial rights of a party or had more than a slight influence on the verdict. *Chism*, 638 F.3d at 640. Likewise, to reverse based on an erroneous jury instruction, the error must have affected the substantial rights of the parties. *Am. Bank of St. Paul*, 713 F.3d at 467–68. In addressing the influence on the verdict, the cumulative effect of errors must be scrutinized. *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 755 (8th Cir. 2000).

As an initial matter, the instruction that Minneapolis was indemnifying Young and Olson *per se* requires reversal. In *Griffin*, for example, the Court held that merely allowing the jury to hear that the

government was indemnifying the defendant was reversible error. 804 F.2d at 1058.  Here, the district court itself—rather than a mere attorney—informed the jury that Minneapolis was paying all damages, including the compensatory and punitive damages against Young and Olson. This was "utterly repugnant to a fair trial or . . . a just verdict" and mandates reversal. *See Ventura*, 825 F.3d at 886.

The fact that Minneapolis was a party to this lawsuit as well as an indemnitor makes no difference for two reasons. First, punitive damages were only available against Appellants Young and Olson. By informing the jury that Minneapolis would be paying any punitive damages against Young and Olson, the district court invited the jury to award an excessive punitive award. There is therefore no meaningful distinction between the prejudice caused to Young and Olson on their punitive damages and the unfair prejudice leading to reversals in *Halladay*, *Griffin*, and *Ventura*.

Second, Minneapolis, as a vicariously liable employer, was only liable insofar as the individual employee would be liable. The jury's job was therefore to decide what damages flowed from each access, regardless of who was paying damages. Accordingly, the only effect of

the district court's instruction was to explicitly tell the jury that Minneapolis would pay all damages and no individual officer would pay anything. The instruction therefore caused unfair prejudice and risked an unduly generous damages award.

Moreover, when the effect of the indemnification instruction is combined with the two evidentiary errors discussed above, there is no doubt that Appellants suffered substantial prejudice. Appellee's entire trial theme weaponized the district court's evidentiary errors and focused the trial on the erroneously admitted evidence. In her opening argument, Appellee deftly explained her case as a jigsaw puzzle with pieces entitled "abuse of power, courage, and coverup." Each of these three pieces corresponded to evidence admitted in error. "Abuse of power" centered on not just the seventy-four accesses on trial, but all 1000 accesses. "Courage" corresponded to Appellee's courage in standing up to retaliation when she pursued her DPPA claims— retaliation from, not by the fifty-eight involved officers, but by other, unnamed Minneapolis employees. And "coverup" corresponded to Appellee's allegation that Minneapolis did not investigate her claims in good faith. Appellee wove these themes into the entire trial and

returned to them in her closing, exploiting the erroneously admitted evidence to tap into damages well beyond the scope of this case.

Although this trial should have been limited to, at most, the approximately 124 accesses by the fifty-eight involved officers, the district court supercharged Appellee's abuse of power claim by admitting 900 other accesses that were either time-barred, performed by other law enforcement agencies, or both. Appellee highlighted the damages from these accesses in her opening:

> [W]hat she learned was shocking. [F]or a nine-year-period between 2003 and 2012, officers and employees from 40 different law enforcement agencies in Minnesota had been accessing Ms. Krekelberg's personal information . . . .

> . . . Ms. Krekelberg's name was queried in the DVS system close to a thousand times by Minnesota law enforcement officers. The state records will show you that during that period approximately 34 Park Police officers had been secretly searching Ms. Krekelberg's information, and during that same period, when she wasn't even working for the Minneapolis Police Department, more than 200 separate Minneapolis police officers were accessing her personal information in the DVS database.

A647-48. Appellee stressed that the evidence of these 1000 accesses was "very critical and important for you to understand and see what was happening, by whom and when." A649. Appellee's opening described

how when she learned that 200—not fifty-eight—MPD officers accessed her data it "caused her great distress." A651.

After admitting her first exhibit, a single page showing a login screen, Trial Ex. App. vol. I at 2, Pl.'s Ex. 1, the next two exhibits were nearly seventy pages of audits showing Appellee's 1000 accesses by 40 different law enforcement agencies. Trial Ex. App. vol. I at 3-72, Pl.'s Exs. 2-3. In other words, the first substantive evidence admitted showed 900 time-barred and irrelevant accesses that immediately dwarfed the proper scope of this trial. Appellee testified that about half of the 1000 accesses were by MPD officers, corresponding to approximately 200 MPD accessors. A883-84. And, then in key testimony about her damages, she drove home that her damages were based on *all* of the accesses:

Q. How did you—what kind of reaction did you have to that?

A. Well, I was shocked. I can't—I couldn't believe at the time. *All these other cities*, but here I transferred to the City and *the very people that I'm working with* are going behind my back. They are looking at my information. Again, I felt sick to my stomach. I felt really violated.

A884 (emphasis added). She directly tied the accesses by more than forty agencies and 200 MPD officers to her damages.

To bolster her claim, Appellee testified about accesses of third parties' data by the fifty-eight officers involved. Appellee testified about seven pages of an audit showing accesses by Bruce Johnson, one of the fifty-eight officers. Appellee detailed how Johnson had looked up famous sports figure, including Kevin McHale, and the famous "Purple People Eaters" from a past Minnesota Vikings football team. A941-42.

It cannot be the case that this highly prejudicial evidence of approximately 900 time-barred and unrelated accesses had only "a slight influence on the verdict," *see Chism*, 638 F.3d at 640. The verdict must therefore be reversed.

Appellee used the erroneously-admitted evidence of alleged retaliation and harassment to construct her "courage" puzzle piece. Describing the evidence in some detail, Appellee told the jury the evidence would show that Appellee was retaliated against because "she had the audacity to demand for accountability" and stood up to "the code of silence." A655-56. Appellee testified she suffered retaliation and harassment because she accused officers of accessing her data:

> I have had a lot of—since trying to hold people accountable, I have had a lot of times I have been excluded from things, times that I wasn't backed up on calls, which, for me, is a huge, huge safety issue.

A981. Appellee continued that this retaliation from *unnamed* Minneapolis employees affected her physically, causing insomnia, stomach issues, heart palpitations and anxiety attacks. *Id.* She also described two incidents where the same car was parked outside her house, and she alleged, based on nothing other than timing, that these events were attempts to intimidate her because of her allegations of DPPA violations. A984-85. Appellee testified that this alleged retaliation and intimidation made her fear for her safety and her children's. A981. Appellee concluded her direct testimony by recapping all of the alleged retaliation she suffered, not by the officers whose accesses were at issue, but by unidentified Minneapolis employees.

> Q. Have your colleagues treated you differently since you brought these issues out?
>
> A. Yes, I think I've gone over a few things. Definitely the biggest thing for me is the safety concern, the backup. There's been other incidences, as I said, I've been excluded, ostracized, just to name a couple of them.
>
> Q. Any incidents happen at work related to this?
>
> A. There's been a few incidents. Again, the backup. I've also—we have mailboxes with our name tags on them. If you are not in the precinct, they take your name tag off of it. There was a whole series of times I came in in the same

week where mine was thrown on the floor, walked over, removed in some cases.

Q. Do you feel you've been given the same opportunities as your colleagues?

A. No, I do not. I've lost some part-time work I've mentioned. I have not received that part-time work because the officer said that I was trouble. That's one of the things, yes.

. . .

Q. . . . I just want to make sure I understand. You've talked about a lot of stuff that happened since you brought this issue to light. Do you think it relates to you holding these officers accountable?

A. I absolutely do think it relates to them.

Q. And why is that?

A. Because these issues got worse as I started to hold them accountable.

Q. And hold them accountable for looking up your driver's license without a permissible purpose?

A. That's correct.

A. Yes, some of these people have been promoted since the accesses.

Q. And what kind of future do you see for yourself, Officer Krekelberg, with the Minneapolis Police Department?

A. Yeah, I've thought about this a lot. It's—it's hard. This is, like I said before, the job I always wanted and in the city I always wanted. It's something that I think about a lot. Right

now I'm in a unit, and could I go back to the street and possibly not have the backup that I need to make sure I'm safe and go home to my children every night? I don't think I could do that. It's—it's hard.

A990-94. Appellee also offered the testimony of a retired MPD officer and an expert witness to explain the ways in which she was retaliated against by Minneapolis and its employees. A1075-122; A1968-87.

Appellee stressed this deep well of damages in her closing argument.

> She's talked about emotional distress. . . . She certainly has lost friends over this. A sense of betrayal, a fear of losing her position with the law-enforcement agency. And that's a big one, ladies and gentlemen.

> She talked about concern for her physical safety, in having a mysterious car show up in front of her place. Concerns for her children. And again, this issue of backup because, as she explained, a few seconds can be life or death.

> . . .

> The mistreatment by her colleagues is repulsive. No longer a part of being on the force. No longer invited to things. Gossip about her. Untrue rumors. You heard her talk about people spilling coffee into her car. Those seem like little things, but think about that and how that makes her feel disrespected. Not one of the team. Not someone people want there.

> She didn't invite this conduct. She was the victim and now she's the victim again because she's tried to do

the right thing. She's lost part-time opportunities of work. She's been told that people don't want to work with her because of this. This is the kind of treatment that we've heard testimony about. . . .

You heard Joel Carlson say I don't think she has a future here. I don't think, at least not a happy one is what he said. Is this what Ms. Krekelberg deserves? In trying to do the right thing, in trying to hold her fellow officers accountable, is that what she deserves? She's been through six years of hell. How do you compensate that? I'm not sure. It's very hard to figure out how you compensate that.

But we're here and we're advocating for our client and we're going to tell you what we think is reasonable. We think that her six years of what she's experienced, what she has to look forward to or not, we think that $300,000 would be fair and reasonable.

A2171-73. Appellee told the jury exactly what they should use to award damages—not the emotional distress that flowed from the seventy-four accesses, but rather the emotional distress from the alleged retaliation and harassment that occurred *in response to her allegations of DPPA violations*. But this is not a retaliation or harassment lawsuit against Minneapolis or its employees. It is a DPPA case based on accesses that occurred before Appellee was even a Minneapolis employee. The district court erred in allowing admission of the evidence, allowing Appellee to tap into damages outside of the scope of her DPPA claims. With her

presentation of evidence and closing argument, Appellee caused substantial prejudice to Minneapolis and Appellants Young and Olson.

Appellee's third puzzle piece, "coverup," consisted of the improperly-admitted evidence of Minneapolis's response to Appellee's claims of DPPA violations. Once again, Appellee set the stage with her opening argument: "Defendant Minneapolis did not address the officers' conduct but effectively tried to cover it up." A653. Appellee then goes on to explain how the evidence will show that the four most recent accesses were investigated thoroughly by McLean, but the investigations into the other seventy accesses were done by two other sergeants, Gomez and Goset, and that those investigations were designed to "coverup" the impermissible accesses of Appellee's data. A653-54.

Appellee then introduced thousands of pages of evidence from the internal affairs files. She called more witnesses on this subject than any other: McLean, Gomez, Goset, and Case. And in her closing argument, Appellee urged the jury to find that Minneapolis engaged in a coverup. A2158-62. "Ladies and gentlemen, if the facts we've presented in this case don't show what a coverup looks like in the Minneapolis Police Department Internal Affairs, then I don't know what does." A2160.

This focus on Minneapolis's response resulted in unfair prejudice because there was no direct-liability claim against Minneapolis. As this Court noted in *Orduno*, where there is no direct-liability claim against a city, there are no damages that flow from an inadequate investigation, so the investigation is irrelevant to the DPPA claims at issue. 932 F.3d at 719. The district court's error allowed Appellee to tap into damage flowing from Minneapolis's alleged fault, which is not actionable in this lawsuit. This was especially prejudicial to Appellants Young and Olson, who are mere employees of Minneapolis; who had no control over Minneapolis's investigation; and who were disciplined by Minneapolis as a result of the investigations.

The cumulative effect of the district court's rulings was to allow Appellee to turn this lawsuit about liability from accesses by fifty-eight individuals into a sweeping case of direct liability against Minneapolis. And lest there was any doubt that the trial was about damages flowing from Minneapolis's conduct and fault, the district court explicitly instructed the jury that Minneapolis would be responsible for paying all damages to Appellee. These errors, and Appellee's exploitation thereof, caused substantial prejudice to Appellants and denied them a fair trial.

The verdict should be reversed. Alternatively, this Court could remit compensatory damages at the statutory minimum for those accesses that survive appeal.

## II. A new trial is also warranted because the district court erred in instructing the jury that a violation of state law is a per se violation of the DPPA.

After the close of evidence, the district court held in an oral ruling that a violation of state law was a per se violation of the DPPA. A1934-35. This ruling was explicitly directed at foreclosing the success of Appellants' argument that using the state driver's license database as a photo-directory of area law enforcement officers could be a permissible purpose under the DPPA. *Id.* Appellants based this argument on the DPPA's broad language, which defines "permissible purpose" as any use by a law enforcement agency "in carrying out its functions." 18 U.S.C. § 2721. Under this broad definition, gleaning the name and face of a fellow law enforcement officers could be allowed by the DPPA under many circumstances.[2] Such usage is not, however, allowed under

---

[2] The district court concluded that this argument as "strained and borderline absurd." Add.16. Quizzically, in the same order, the district court ordered Minneapolis to create a photo-directory for its police officers. It concluded that "sworn officers of the MPD reasonably require

Minnesota state law. *See* Trial Ex. App. vol. I at 181, Pl.'s Ex. 8R. The district court completed its culling of Appellants' argument when it instructed the jury that it had "determined that, as a matter of law, any access of DVS records that violates applicable City of Minneapolis Police Department policy, state law, or regulation cannot be carrying out a function of that agency, therefore, is for an impermissible purpose." A2199.

This instruction was an abuse of discretion because it is contrary to the DPPA's plain meaning and federal law. The DPPA provides that a driver's personal information may be used by a government agency in carrying out its functions. 18 U.S.C. § 2721(b)(1). Statutory interpretation starts with the language of the statute. *Williams v. Taylor*, 529 U.S. 420, 431 (2000). The court should resist reading words or elements into a statute that do not appear on its face, and the ordinary meaning of the language is the expression of the legislative purpose. *Bates v. United States*, 522 U.S. 23, 29 (1997). Additionally, there is no overarching reason to assume that a violation of federal law

---

access to an internal directory of their fellow officers which includes identification photographs." Add.36.

may be shown through a violation of state law. *See, e.g.*, *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995) ("[N]ot every transgression of state law does double duty as a constitutional violation") (quotation marks omitted); *Williams v. Nix*, 1 F.3d 712, 717 (8th Cir. 1993) ("[W]ithout more, the mere violation of a state law or rule does not constitute a federal due process violation"); *Smithrud v. City of St. Paul*, No. 10-4452 (JNE/JSM), 2012 WL 4129299, at *9 n.10 (D. Minn. Sept. 18, 2012) ("[T]he City's alleged violation of the State Building Code, in and of itself, does not constitute an FHA violation").

In fact, where Congress intends that violation of a state law should give rise to a federal cause of action or criminal violation, it says so explicitly. This appears in a wide variety of laws in the very same chapter as the DPPA. *See, e.g.*, 18 U.S.C. § 922(b) (making unlawful sale or delivery of a firearm "in any State where the purchase or possession by such person of such firearm would be in violation of any State law"); 18 U.S.C. § 1955(b) (defining "illegal gambling business" as one which "is a violation of the law of a State or political subdivision in which it is conducted"); *see also, e.g.,* 18 U.S.C. §§ 842(c), 1030(c)(2)(B)(ii), 1958(a), 1959(a), 2331(1)(A), 2701(b)(1).

Where intended, the statutes surrounding the DPPA allow state law violations to demonstrate violation of the federal law in question. In contrast, the DPPA does not contain any such provisions. There is no reason to suppose the DPPA's omission of state law or local policy was inadvertent. Congress could easily have decided that only certain uses of driver's license databases warrant a federal claim, and the attendant compensatory and punitive damages, and fee shifting. Because there is no basis in the statute to allow federal liability under the DPPA for violation of state law or local policy, the district court's instruction was an abuse of discretion.

The erroneous instruction also had a substantial effect on the verdict, and reversal is therefore justified. Appellee capitalized on the district court's error by pointing the jury to the Legislative Auditor's Report which defines the strictures of the state law[3]:

> [W]e refer to Exhibit 8 which was the Legislative Auditor's Report that was very clear as to what is appropriate use or accessing of a DVS database. Again, I'll refer you to Exhibit 8 and you'll recall that that chart indicated that it is not appropriate for law enforcement supervisors to look up photographs to put a face with a name. You'll recall that it

---

[3] Appellants objected to Appellee's closing remarks, and the district court overruled the objection. A2183. Appellants also objected to the admission of Ex. 8R. Add.50-51. These ruling add to the error here.

> says that officers are not allowed to run information to
> inform them of other law-enforcement personnel in
> neighboring jurisdictions to help see who they are.

A2146-47. But Exhibit 8R also explains that use of driver's license data

under state law is "narrower than what federal law allows." Trial Ex.

App. vol. I at 174, Pl.'s Ex. 8R. Exhibit 8R explains that state law limits

law enforcement uses of photographs to the investigation and

prosecution of crimes and other listed uses. *Id.* In contrast, federal law

would permit use "by any government agency, including any court or

law enforcement agency, in carrying out its functions." *Id.* Exhibit 8R

further explains that, under state law, looking up a law enforcement

officer in a neighboring jurisdiction to see who they are, is not allowed.

*Id.* at 180-81. Additionally, "[t]hese uses might be work-related, but

they do not seem to fall within the uses allowed by state law." *Id.*

Accordingly, by pointing the jury to Exhibit 8R, Appellee led the jury

right to where it would find that using driver's license data as a photo-

directory of fellow law enforcement officers violates state law, thereby

violating the DPPA under the district court's erroneous instruction.

It is also important to note that for all seventy-four accesses,

Appellee testified that she had not been subject to a traffic stop or a

criminal investigation or prosecution—a point that Appellants did not contest. *See, e.g.*, A2148. The prejudice comes into sharp view because under the state law, as explained in Exhibit 8R, any access of a driver's license photograph without a traffic stop or investigation is—setting aside a few exceptions not relevant here—impermissible. Accordingly, Appellee established all seventy-four accesses as violating the DPPA through the district court's erroneous instruction. The instruction therefore substantially affected the verdict because it guaranteed violations of the DPPA.

Alternatively, if this Court does find that violation of state law is a per se violation of the DPPA, then this is a novel interpretation of federal law that was not clearly established at the time of the accesses and many officers should have qualified immunity which would defeat the merits of their direct-liability claims and bar vicarious-liability claims against Minneapolis. *Mallak v. City of Brainerd*, No. CV 13-2119 (DWF/LIB), 2017 WL 440249, at *18 (D. Minn. Feb. 1, 2017) ("[B]ecause the Court has concluded that [the agent] is entitled to qualified immunity for her accesses . . . Plaintiff no longer has a viable claim to support vicarious liability against [the principal].") Under this

circumstance, the Court should remand to the district court for a determination of which claims must be dismissed on this basis. In any event, the district court's novel interpretation of the DPPA puts the verdict in an untenable whipsaw.

## III. This Court should remit the jury's punitive damages award because of a failure to show reprehensibility and because they are grossly excessive.

This Court reviews the constitutionality of punitive damages de novo. *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012). "It should be presumed a plaintiff has been made whole by compensatory damages, so punitive damages should only be awarded if the defendant's culpability is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The Due Process Clause of the Fourteenth Amendment also prohibits assigning "grossly excessive" civil punishments against tortfeasors. *Ondrisek v. Hoffman*, 698 F.3d at 1027. Three factors determine whether punitive damages are considered grossly excessive: (1) the reprehensibility of the defendant's conduct, (2) the ratio between the plaintiff's actual harm and the punitive damages award, and (3) the

difference between the case's punitive award and those imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). The degree of the defendant's reprehensible conduct is the most important factor. *BMW*, 517 U.S. at 575; *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 796 (8th Cir. 2004). In assessing reprehensibility, the courts consider five factors: (1) whether the harm was physical or economic, (2) whether the conduct demonstrated an indifference to or a reckless disregard of the health or safety of others, (3) whether the victim was financially vulnerable, (4) whether the conduct involved repeated actions or was an isolated incident, and (5) whether the harm was the result of intentional malice, trickery, deceit, or a mere accident. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 839 (8th Cir. 2005).

Even in circumstances where a defendant's conduct is "exceptionally reprehensible," the court will generally not permit a double-digit punitive-to-compensatory damages ratio to stand. *See Ondrisek*, 698 F.3d at 1030 (reducing the punitive damages award from a 10:1 ratio to a 4:1 ratio in a multi-million-dollar case where a religious leader was found to have abused children). Courts have held that while

a single-digit ratio between punitive and compensatory damages may satisfy due process requirements, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *See State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425. If a punitive damages award exceeds due process limits, the court can remit it to an amount that is "sufficiently punitive, but that does not violate notions of fundamental fairness." *JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 877 (8th Cir. 2008) (quotation marks omitted).

First, any award of punitive damages is unsupportable for failure to show reprehensibility. There was *no evidence* that Appellants Young or Olson caused physical harm; or that they acted with indifference to or reckless disregard of Appellee's safety; or that they engaged in intentional malice, trickery, or deceit; or that they accessed the data more than once; or that Appellee was financially vulnerable. *See Diesel Mach.*, 418 F.3d at 839. The evidence simply does not support a finding of "exceptionally reprehensible" conduct. Moreover, in post-verdict motion practice, Appellee took the position that the evidence showed that Young's and Olson's conduct was not willful. A2235. With no

showing of reprehensibility, the award of punitive damages should be reversed.

Second, even if an award of punitive damages is allowed, the jury's award is excessive and must be remitted. The starting point for this analysis is the ratio of damages, determined by "divid[ing] the individual punitive damages awards by the individual *pro rata* shares of the actual damages." *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000). Over Appellants' objections, the district court did not allow the jury here to distinguish between accesses or defendants in making its compensatory damages award, and Plaintiff did not argue that there were any differences in the amount of harm suffered per access. Therefore, both Young and Olson have a 1/74 share of the award, or approximately $3,850. The punitive damage award against each, then, is approximately 39:1, a ratio that is well in excess of awards considered constitutional.

In light of the paucity of reprehensibility evidence, the punitive damages award here is staggering compared to those few DPPA cases that also awarded punitive damages. *See Pietrzak*, No. 14-1393 ADM/DTS, 2017 WL 4354686, at *1 (D. Minn. Sept. 29, 2017)

(describing $85,000 punitive damage award against police chief who accessed former city administrator's information six times); *Truesdell v. Thomas*, No. 5:13-cv-552-Oc-10PRL, 2016 WL 7205490, at *1 (M.D. Fla. Sept. 8, 2016) (describing $5,100 punitive damage award against deputy sheriff who accessed plaintiff's data twice); *Menghi v. Hart*, 745 F. Supp. 2d 89, 109–10 (E.D.N.Y. 2010) (after remitting compensatory damages to $500,000, remitting punitive damage award to $100,000 where defendant unlawfully accessed plaintiff's information three times after arresting her and then made harassing and threatening calls that included rape threats). The punitive damages award here violates Defendants' due process rights because of the lack of evidence of reprehensibility, huge damage ratio, and lack of similarity to other cases. The punitive damages should be remitted to zero or, at most, to a ratio of around 1.

## IV. Appellee's vicarious-liability claims fail because the statute-of-limitations dismissal of the direct-liability claims is "on the merits" under federal law and thereby forecloses vicarious liability.

The district erred in declining to grant Minneapolis judgment as a matter of law on the vicarious-liability claims associated with time-

barred direct-liability claims.[4] This court reviews de novo a denial of judgment as a matter of law, viewing the evidence most favorable to the jury's verdict. *Am. Bank of St. Paul*, 713 F.3d at 461–62.

The district court dismissed, as time-barred, the direct-liability claims for all of the accesses except Young's and Olson's, but it allowed the vicarious-liability claims to proceed; this case therefore presents the issue of whether, under the DPPA, a time-barred direct-liability claim is fatal to the vicarious-liability claim.

## A. When the DPPA was enacted in 1994, dismissal of a claim against an agent on statute-of-limitations grounds mandated dismissal of vicarious-liability claims.

As this Court has noted before, the DPPA does not address vicarious liability at all, let alone this specific vicarious-liability issue. *Orduno*, 932 F.3d at 718. In such cases, the Court "assumes 'when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious-liability rules and consequently

---

[4]     This issue was preserved throughout the litigation. It was raised as a dispositive motion. Add.55. It was raised as a directed verdict, A1687, which was renewed at the close of all evidence, A1918. Minneapolis also raised the issue in its motion for judgment notwithstanding the verdict. A2289.

intends its legislation to incorporate those rules.'" *Orduno*, 932 F.3d at 718 (quoting *Meyer v. Holley*, 537 U.S. 280, 285 (2003)). More specifically, "the ordinary tort-related vicarious liability rules" that are incorporated are those established when the federal statute was enacted. *Id.* As such, the correct analysis here begins with the state of "ordinary tort-related vicarious liability rules" in 1994, when the DPPA was enacted. *Id.*

In *Orduno*, this Court addressed other DPPA vicarious-liability issues related to the aided-by-the-agency and scope-of-employment variants of vicarious liability.[5] In doing so, the Court held that the Restatement (Third) of Agency was not relevant to its analysis because it was published in 2006, well after the DPPA was enacted. The Court

---

[5] Minneapolis raised the same argument below: that Appellee's vicarious-liability claims fail because (1) the DPPA's requirement of an impermissible purpose means that any actionable accesses of data were not under a "scope of employment"; and (2) use of an employer-provided computer and login credentials is not sufficient to establish aided-by-the-agency liability. The district court disagreed. *See* Add. 49. *Orduno* appears to support the district court's ruling on the issue, and this panel is obligated to follow *Orduno*. Nevertheless, Minneapolis hereby appeals from the district court's ruling to preserve the issue for potential further review *en banc*. Unlike the appellants in *Orduno*, Minneapolis does not rely on the Restatement (Third) of Agency. Instead, Minneapolis asserts that the correct interpretation of the Second Restatement disallows Appellee's vicarious-liability claims.

stated, "the relevant inquiry is what background principles were well established when the DPPA became law in 1994." *Orduno*, 932 F.3d at 717.

In 1994, two jurisdictions and the Restatement (Second) of Agency had addressed this issue by reasoning that a dismissal on statute-of-limitations grounds of direct-liability claims forecloses the vicarious claims. The Restatement notes that principal and agent may be joined in an action alleging only the tortious conduct of the agent. Restatement (Second) of Agency § 217B(1). That is what this case presents—the joinder of direct-liability claims against the agents, the individual officers, with the vicarious-liability claims against the principal, Minneapolis. Section 217B(2) then states, "If the action is based solely upon the tortious conduct of the agent, judgments on the merits *for the agent* and *against the principal* . . . are erroneous." In other words, section 217B prohibits judgments for the agent but against the principal if: (1) the claims are joined; (2) the claims are based solely on the agent's tortious conduct; and (3) the judgment for the agent was "on the merits."

Here, all three elements are met and the Restatement's rule therefore operates to foreclose the vicarious-liability claims. First, Appellee joined her claims against a principal—Minneapolis—with her claims against its agents, the various individual officers who were alleged to have impermissibly accessed her data. Second, the claims against principal Minneapolis are based solely on the tortious conduct of its agents because the claims against Minneapolis here are based on the alleged impermissible accesses by the individual officers.

Third, the dismissal of the direct-liability claims resulted in a "judgment on the merits" for the individual officers. The phrase "judgment on the merits" is not defined in the Restatement, but the phrase is a term of art used in Federal Rules of Civil Procedure and the federal common law of res judicata. Under both situations, a dismissal on statute-of-limitations grounds is "on the merits." Federal Rule of Civil Procedure 41(b) states that "any dismissal not under this rule— except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." Under Rule 41, then, "a dismissal for failure to comply with a statute of limitations is a final adjudication on the merits." 9 Charles Alan

Wright, *et al.*, Federal Practice and Procedure § 2373 (3d ed. 2017)

(citing, inter alia, *Myers v. Bull*, 599 F.2d 863, 865 (8th Cir. 1979)).

Therefore, the Federal Rules give a precise definition of "on the merits,"

one which includes a statute-of-limitations dismissal.

Moreover, although the issue before the Court is not a res judicata

issue, central to that law is whether a judgment is "on the merits." In

the law of res judicata and collateral estoppel, a judgment may only

have preclusive effect if it was a judgment on the merits. *See Plaut v.

Spendthrift Farm, Inc.*, 514 U.S. 211, 228 (1995). Notably, different

jurisdictions, in developing res judicata law, have adopted different

definitions of "on the merits." *Compare Plaut*, 514 U.S. at 228 (under

federal law statute-of-limitations dismissal is a judgment on the merits)

*with Leow v. A & B Freight Line, Inc.*, 676 N.E.2d 1284, 1289 (Ill. 1997)

(under Illinois law statute-of-limitations dismissal is not a judgment on

the merits). Accordingly, the correct analysis of whether a statute-of-

limitations dismissal is "on the merits" is to look specifically at how the

federal law treat it. And under federal law, "the rules of finality, both

statutory and judge made, treat a dismissal on statute-of-limitations

grounds the same way they treat a dismissal for failure to state a claim,

for failure to prove substantive liability, or for failure to prosecute: as a judgment on the merits." *Plaut*, 514 U.S. at 228. The statute-of-limitations dismissal of direct-liability claims against the MPD officers is therefore a judgment on the merits for them, a judgment that is fatal to the vicarious-liability claims against Minneapolis.

Case law when the DPPA was enacted also supports the conclusion the Appellee's time-barred direct-liability claims foreclose the vicarious-liability claims. When the DPPA was enacted in 1994, two state supreme court cases had applied the section 217B(2) to foreclose vicarious-liability claims where the underlying direct-liability claims were time-barred. In *Greco v. Univ. of Delaware*, 619 A.2d 900, 904 (Del. 1993) *overruled by Verrastro v. Bayhospitalists, LLC*, 208 A.3d 720 (Del. 2019), the plaintiff sued a doctor and her employer under a theory of medical malpractice. The claims against the employer were for vicarious liability and based solely on the alleged negligence of the doctor. *Id.* at 903. The direct-liability claims against the doctor had been dismissed as time-barred. The *Greco* court reasoned that "a viable cause of action against the employee for negligence is a condition precedent to imputing vicarious liability for such negligence to the employer pursuant to the

theory of respondeat superior." *Id.* (citing, inter alia, Restatement (Second) Agency § 217B(2) (1958)). Likewise, when the DPPA was enacted, the highest court in New York had reasoned that a vicarious-liability claim is foreclosed when the underlying direct-liability claim is time-barred: "the [employee's] liability . . . was effectively extinguished when the Statute of Limitations on plaintiff's cause of action in libel expired, however, any vicarious liability that [the employer] might have had in consequence of its employees' alleged misconduct must similarly be deemed extinguished." *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 546 (1980).

After the DPPA was enacted, however, the case law on this issue has developed in a convoluted way in various jurisdictions.[6] This

---

[6] For example, after *Greco*, in 1997 the Illinois supreme court came to the opposite rule as that espoused in *Greco* and *Karaduman. Leow*, 676 N.E.2d 1284. That same year, the Florida court of appeals applied the rule espoused in *Greco* and *Karaduman. Buettner v. Cellular One, Inc.*, 700 So. 2d 48, 48-49 (Fla. Dist. Ct. App. 1997). Since that time the case law has continued to split. Between 1997 and when the district court denied Minneapolis's motion below, four more jurisdictions held that the vicarious liability claims were extinguished, *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1078 (S.D. Ala. 2007); *Al-Shimmari v. Detroit Med. Ctr.*, 731 N.W.2d 29, 36-38 (Mich. 2007); *Stephens v. Petrino*, 86 S.W.3d 836, 843 (Ark. 2002); *Kapitan v. DT Chicagoland Express Inc.*, Civ. No. 2:12-321, 2013 WL 5655704, at *2-4 (N.D. Ind.

modern split of authority, however, does not weigh against the

conclusion that this Court should find that the DPPA vicarious-liability

claims here are barred. The vicarious-liability claims are barred by the

law applicable in 1994, and that is the law incorporated into the DPPA,

and so those claims are barred today.

**B. The better rule bars vicarious liability where individual liability is foreclosed, contrary to some recent divergent authority.**

**1. Under federal law, a statute of limitations dismissal is a dismissal on the merits, barring vicarious-liability claims.**

Even if the post-DPPA cases that allow vicarious-liability claims

to survive were considered, this Court should reject such a rule here. A

critical point with section 217B is that it neither defines "on the merits"

---

Oct. 15, 2013); but four additional jurisdictions held that the vicarious liability claims survived, *Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 520-21 (5th Cir. 2009) (applying Louisiana law); *Hughes v. Doe*, 639 S.E.2d 302, 304 (Va. 2007); *Juarez v. Nelson*, 2003-NMCA-011, ¶¶ 26-29, 61 P.3d 877, 886-87, overruled on other grounds by *Tomlinson v. George*, 2005-NMSC-020, 116 P.3d 105; *Cohen v. Alliant Enters., Inc.*, 60 S.W.3d 536, 537-39 (Ky. 2001).

To make matters more divergent, since the district court issued its order here, two jurisdictions, with one citing the district court's order below, have reversed themselves and held that the vicarious-liability claims survive. *Verrastro v. Bayhospitalists,* 208 A.3d 720, 725 (Del. April 8, 2019); *Cameron v. Osler*, 930 N.W.2d 661, 666 (S.D. 2019).

nor specifically states that a statute-of-limitations dismissal bars a vicarious-liability claim. As such, whether a statute-of-limitations dismissal is on the merits is a function of the law of the jurisdiction. Some jurisdictions treat it as on the merits, and others do not.

In *Leow*, for example, Illinois was the first jurisdiction to allow the vicarious-liability claim to survive, but its analysis was based on Illinois law that is different from the federal law that controls this case. 676 N.E.2d 1284. The *Leow* court determined that the issue turned on whether the dismissal of the direct-liability claims was "on the merits" for purposes of res judicata. *Id.* at 1285-86. Interpreting the Illinois code of civil procedure, the *Leow* court held that a dismissal based on the expiration of the statute of limitations was not an "adjudication on the merits" for the purposes of res judicata and therefore did not have preclusive effect. *Id.* at 1289. Because a dismissal based on the statute of limitations was not "on the merits" under res judicata, the *Leow* court reasoned, the dismissal did not bar the vicarious-liability claims against the principal. *Id.* at 1286-89. As discussed above, this is not the case for federal law: "the rules of finality, both statutory and judge made, treat a dismissal on statute-of-limitations grounds . . . as a judgment on the

merits." *Plaut*, 514 U.S. at 228. The analysis from *Leow* therefore supports the conclusion that dismissal of the direct-liability claims in this case bars the vicarious-liability claims because federal res judicata law treats a time-bar as having preclusive effect.

### 2. Judgments arising from litigation cannot be neatly sorted into conduct-based or not.

The crux of the rule adopted by the diverging courts and the district court below is that the statute-of-limitations dismissal should not bar the vicarious-liability claims "because it does not actually address if the agent's conduct supports an actionable claim." (Add.74.) And while this is true, such a distinction is an unworkable and unfair way of determining the effect of a judgment, because judgments arising from litigation are simply not categorized in such a manner.

For example, an employee doctor wins summary judgment "on the merits" of the medical malpractice claim against him. There is no doubt that such a judgment would be fatal to a vicarious-liability claim against the employer in the same lawsuit. There is, however, no reason to believe that the judgment addressed the conduct of employee. Perhaps the employee won the medical malpractice claim because the plaintiff did not timely disclose the required expert on the standard of

care. Or perhaps the evidence needed to create a material issue of fact was not submitted to the district court in the record but only referred to at oral argument, with all parties knowing that the evidence existed but the court refusing on procedural grounds to consider it. Or perhaps the necessary evidence is in the record, but the plaintiff failed to give a specific citation to it, and the district court declined to search the record to find the evidence necessary to keep the claim alive. *Crossley v. Georgia-Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004) ("[A] district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim . . . . Judges are not like pigs, hunting for truffles buried in briefs.") (citations and quotation marks omitted).

It cannot be said that the judgment in any of these examples addressed the actual conduct of the employee. Instead, the employee won a judgment on procedural grounds. Judgments that turn on these procedural issues are not rare, and they address the conduct of a defendant no more than a statute-of-limitations dismissal. Drawing a distinction between judgments that address "the conduct" of a defendant and those that do not is unworkable and rests entirely on the

fiction that judgments can be grouped into those that address a litigant's conduct and those that do not. If this were the basis for the rule, each judgment would have to be analyzed case by case based on the totality of circumstances. Accordingly, determining the preclusive effect of a judgment based on whether a litigant's conduct is evaluated is an unworkable criterion.

### 3. Sound policy justifications bar vicarious-liability claims after dismissal of direct-liability claims.

Finally, sound policy justifications support barring the vicarious-liability claims once the direct-liability claims have been brought in the same lawsuit and dismissed as time-barred.

Allowing the vicarious-liability claims to go forward would leave agents vulnerable to indemnification claims from the principal even though a judgment on the merits was entered in the agent's favor on the direct-liability claim. Section 217B explains that this is at the core of the rule prohibiting judgments on the merits for the agent but against the principal in the same lawsuit. The comments to section 217B state that "[i]f the principal is liable only because of the derelictions of the agent, the principal may be entitled to indemnity from the agent. Hence, if a judgment against the principal were allowed to stand, either

the agent could be required to indemnify the master for an act for which a court found him not liable to the other party, or the principal would be deprived of his right of indemnity." *See id.* (reporters comments).

Further, barring the vicarious-liability claims prevents courts from issuing inconsistent judgments in the same lawsuit. Here, the district court issued a judgment on the merits in favor of the agents but against the principal for the same conduct. This is problematic because the vicarious-liability claims required Appellee to prove that the agent was at fault, which is directly contradicted by the judgment in favor of the officers—judgments which Rule 41 and the federal law of res judicata treat as being on the merits. When a court issues a dismissal on the merits, it states that the defendant is not at fault for the purposes of the legal system—it states that the claim against the defendant fails and will always fail. The defendant can therefore hold the judgment up to the world and proclaim that his or her name has been cleared. Because a dismissal on statute-of-limitations grounds is on the merits under the federal law, federal courts give such a dismissal this very status.

Here, the judgment against Minneapolis is therefore in conflict with the judgment in favor of its agents. Over fifty individuals were dismissed from the lawsuit—under Rule 41 and federal res judicata law, they won on the merits. Nevertheless, Appellee was allowed to continue her case alleging that they were at fault and she won without all but a handful even testifying. Conflicting judgments like this are at the heart of the law underlying res judicata and collateral estoppel because allowing them gives the appearance of arbitrary justice and decreases the public's confidence in our judicial system. Furthermore, the operation of section 217B—the issue before the Court—does not even address conflicting judgment from different jurisdictions, like the law of res judicata. It addresses the special case of conflicting judgments issuing from the same court in the same lawsuit. It must strike the lay public as arbitrary and erode their confidence that the district court issued a judgment finding that fifty-six MPD officers won their cases "on the merits" under Rule 41 but it nevertheless issued a judgment in the same lawsuit finding that Appellee won her claims that depended on proving the wrongdoing of those same fifty-six officers. Such judgments should not be allowed.

And, as a final policy point, allowing the vicarious-liability claim to go forward vitiates much of the protection provided by a judgment on the merits. A successful statute-of-limitations defense provides a defense without having to undergo substantial litigation. If the vicarious-liability claim goes forward, the burden of litigating stale claims is thrust back on the agent because he or she will be central to the vicarious-liability claim. Further, an ongoing vicarious-liability claim poses the threat of collateral consequences for the agent. A successful vicarious-liability claim may expose the agent to discipline by his or her employer, investigations by government agencies, and even negative public opinion—these are all important aspect of claims against police officers. So, even if the agent has won a statute-of-limitations defense, the agent might well be compelled to participate in the vicarious-liability litigation to nearly the same extent as a direct-liability claim. Accordingly, allowing a vicarious-liability claim to survive guts the protections of the statute-of-limitations defense, protections that are conferred on it by Rule 41 and federal res judicata law.

# CONCLUSION

For the reasons stated above, the vicarious-liability claims based on time-barred direct-liability claims should be dismissed, and a new trial should be granted on the remaining claims because of the district court's errors. In the alternative, the punitive damages should be remitted to zero.

Dated: June 3, 2020

ERIK NILSSON
Interim City Attorney
By

s/ *Brian S. Carter*
Brian S. Carter (No. 0390613)
Sharda Enslin (No. 390470)
Ivan Ludmer (No. 0389370)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
Phone: (612) 673-2063
Fax: (612) 673-3362
brian.carter@minneapolismn.gov
sharda.enslin@minneapolismn.gov
ivan.ludmer@minneapolismn.gov

*Attorneys for Appellants City of Minneapolis and Heather Young*

Dated: June 3, 2020

JARDINE, LOGAN & O'BRIEN, PLLP

*/s/ Joseph E. Flynn*

Joseph E. Flynn, #165712
8519 Eagle Point Boulevard
Suite 100
Lake Elmo, MN  55042
Phone: (651) 290-6500
Fax: (651) 223-5070
jflynn@jlolaw.com

*Attorneys for Appellant Matt Olson*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify that this brief is typed in Microsoft Word 2016 using 14-point type and "Century Schoolbook" proportionally-spaced font. The length of this brief is, with allowed exclusions, 12,834 words.

I further certify that the electronic versions of this brief provided to the Court and parties has been scanned with Symantec Endpoint Protection and has been found to be virus-free.

Dated: June 3, 2020

ERIK NILSSON
Interim City Attorney
By

s/ *Brian S. Carter*
Brian S. Carter (No. 0390613)
Sharda Enslin (No. 390470)
Ivan Ludmer (No. 0389370)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
Phone: (612) 673-2063
Fax: (612) 673-3362
brian.carter@minneapolismn.gov
sharda.enslin@minneapolismn.gov
ivan.ludmer@minneapolismn.gov

*Attorneys for Appellants City of Minneapolis and Heather Young*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: June 3, 2020

ERIK NILSSON
Interim City Attorney
By

s/ *Brian S. Carter*
Brian S. Carter (No. 0390613)
Sharda Enslin (No. 390470)
Ivan Ludmer (No. 0389370)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
Phone: (612) 673-2063
Fax: (612) 673-3362
brian.carter@minneapolismn.gov
sharda.enslin@minneapolismn.gov
ivan.ludmer@minneapolismn.gov

*Attorneys for Appellants City of Minneapolis and Heather Young*